**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

THE BRADLEY COMPANY, INC. and STEVEN
SCHWARTZ,

       Plaintiffs,

v.                                      Case No. 05-CV-71109-DT

SANDFORD NORTH AMERICA, a division of
NEWELL RUBBERMAID, INC.,

       Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the court is Defendant's motion for summary judgment, which has been fully briefed and on which the court conducted a hearing on June 21, 2006. For the reasons stated below, the court will grant Defendant's motion.

**I. BACKGROUND**

Plaintiff Steven Schwartz is the owner of Plaintiff the Bradley Company, a marketing company located in Farmington Hills, Michigan. (Pl.'s Dep. at 4.) The Bradley Company has two employees, Mr. Schwartz and his assistant, Emily Sherman, along with some part-time salespeople. (*Id.* at 5.) Defendant Sandford North America, a subsidiary of Newell Rubbermaid, manufactures writing and art supplies, including Papermate, Parker, Uni-ball pens, "Accent" highlighters, "Liquid Paper" correction fluid, and the item at the center of controversy here, "Sharpie" permanent markers. (Def.'s Mot. at 2.) Defendant is comprised of several divisions, including its "Business-to-

Business" division. (Stolz Dep. at 215-16.)[1] Golfers commonly use Defendant's Sharpie markers to mark their golf balls in an effort to distinguish their balls where more than one golfer is using the same type of ball. (Def.'s Mot. at 2-3.) As early as 1997-1998, Defendant was marketing Sharpies to golf courses. (Stolz Dep. at 25-26.) Defendant had "[o]rders for golf country clubs through promotional products distributors, orders for golf clubs, golf courses through golf distributors and some preliminary discussions with other promotional product golf suppliers." (*Id.* at 44.) Defendant, however, was "trying to figure out the best channel to reach golf courses." (*Id.* at 228.)

Plaintiff has testified that, in about August 2004, he was at the Firestone Country Club in Akron, Ohio and noticed "Sharpies" in a bin display and felt that they were not being "displayed correctly." (Pl.'s Dep. at 112-13.)[2] Plaintiff testified that in October or November of 2004, he was at the Pinehurst Country Club, and again "questioned . . . why . . . [Defendant did not] put [the bin] up on the counter like their golf balls." (*Id.* at 113.)[3] In August 2004, Plaintiff contacted Defendant and stated that he "had an idea for utilization of 'Sharpie' logo'd pens." (*Id.* at 23.)[4] Plaintiff first spoke to Mr. William

---

[1] Mr. Stolz is the president of Defendant's Business-to-Business Division.

[2] Prior to forming his company, Plaintiff had sold "Sharpies" at a "couple of tournament[s] . . . of some logo'd product relative to golf courses" without the use of a canister. (*Id.* at 95.)

[3] In his deposition testimony, Plaintiff also acknowledged that during the summer of 2004 logo "Sharpies" were already being marketed to golf courses through fliers and sales representatives and the concept of marketing to golf courses was, therefore, "not a new idea." (*Id.* at 72.)

[4] Prior to contacting Defendant, Plaintiff's familiarity with Defendant's marketing of "Sharpies" came from the Firestone and Pinehurst golf courses and the "courses and the companies in the tournaments that they said they were working with." (*Id.* at 114.)

Carvel, a channel marketing manager in Defendant's retail division. (*Id.* at 69.) Mr. Carvel sent an e-mail to Lloyd Falshaw, a salesperson in Defendant's Emerging Markets Division, Matthew Millies, the "Sharpie" brand manager in the Retail Division, and Mr. Stolz. The email stated:

> Steve Schwartz contacted me to explore an idea he has developed to logo sharpies for sale through the golf pro shop segments.
> I know we have developed various programs in the past but am not familiar enough with the details to advise Steve if his idea has been or is all [sic] ready been marketed.
>
> He is an ASI member and buys via our B2B division. I would recommend Matt talk with Steve and advise. Lloyd and Bob if you have any thing in the works for this segment that Matt might not be aware of please shoot him a note.

(Def.'s Mot. at Ex. 4.) Plaintiff also had a conversation with Mr. Falshaw, and discussed his idea of "utilizing logo'd merchandise on display at pro golf courses" and inquired as to what displays were available. (Pl.'s Dep. at 26.) Mr. Falshaw wrote the following in an e-mail to Mr. Carvell, Mr. Stoltz, Mr. Millies, and Plaintiff:

> This is a viable idea. Many Pro Shops like the idea of logo Sharpies to either retail, or use during tournaments, member guests, etc. The challenge is that there are thousands of small regional dealers that service golf clubs. We are currently selling to 7 of the larger dealers.
> The dealers that are selling Logo Sharpies generally send a flyer or Sales Rep directly to Pro Shops announcing the availability of Logo Sharpies. Please contact me with any questions.

(Def.'s Mot. at Ex. 5.) In addition, Mr. Falshaw sent Plaintiff a photograph of one of Defendant's then current golf pro-shop Sharpie display units via an e-mail attachment. (*Id.*; Pl.'s Dep. at 24-25.) In an additional e-mail, Mr. Stoltz wrote:

> I agree with Lloyd, the idea is out there and works. The issue is reach. In addition to the top 7, that Lloyd mentioned we are seeing great growth in traditional ASI distributors. Getting plenty of orders for Club logo's and also specific tournament logo's. That said, I think we are still just

3

>scratching the surface.  If Steve [Schwartz] has some ideas for a targeted effort we'd be happy to work with him.

(Def.'s Mot. at Ex. 6.)  In his deposition, Mr. Stolz testified that he "didn't see anything in th[e] email that led [him] to believe that [Plaintiff] had come up with a valuable idea." (Stolz Dep. at 60.)

Plaintiff then "talked [to Mr. Stolz] about [his] idea of marketing to pro shops via utilizing a display that would be able to have your logo visible to the individuals purchasing these products."  (Pl.'s Dep. at 28, 31.)  At the time, Plaintiff had not created the display, but planned to create a display and test it by sending out 50 different logo'd samples to golf courses.  (*Id.* at 32-36.)  Mr. Stolz, testified that he had in his mind "getting [Plaintiff] as a distributor partner."  (Stolz Dep. at 94-95.)  In addition, Plaintiff testified that Mr. Stolz told him that Defendant's current marketing of "Sharpies" to golf courses "wasn't working well" and informed Plaintiff that the only way they were selling the "Sharpies" was in "bulk to [B]usiness to [B]usiness."  (Pl.'s Dep. at 34, 42.)  Between September 2004 and January 2005, Plaintiff did not conduct a test of his display idea. (*Id.* at 37.)

In January 2005, Plaintiff asked to meet with Mr. Stolz at the Promotional Products Association show in Las Vegas.  (Pl.'s Dep. at 38, 129.)  Plaintiff testified that the parties "were negotiating on all aspects."  (*Id.* at 146.)  Plaintiff showed Mr. Stolz and Mr. Chad Hendrickson, also of Sanford Business-to-Business, a display concept made of paper and designed to hold 32 individual "Sharpies."  (*Id.* at 43-45; Def.'s Mot. at Ex. 8.)

4

Mr. Stolz agreed to show the display to golf pros at a PGA show in Orlando, Florida the following week. (Stolz Dep. at 112-13, 116; Pl.'s Dep. at 45.) The following week, at the PGA show, Defendant showed potential customers a photograph of Plaintiff's display and a promotional flier that Plaintiff created. (Pl.'s Dep. at 119-21.) Plaintiff did not receive any calls relating to his display and he never sold a display. (*Id.* at 48-49; 150-51.) Plaintiff asked Defendant if he could test market the "Sharpie Golf Canisters" with 50 logos imprinted. (*Id.* at 51-52.) Defendant agreed and on January 31, 2005, Mr. Hendrickson sent Plaintiff pricing for the Sharpie Golf Canisters. (Def.'s Mot. at Ex. 9.) Mr. Stolz later concluded, however, that Defendant preferred to use multi-line golf representatives. (Stolz Dep. at 211.) On February 24, 2005, Mr. Stolz told Plaintiff that Defendant had decided to use these multi-line golf sales representatives. (*Id.* at 178; Pl.'s Dep. at 52.) On March 9, 2005, Plaintiff billed Defendant $35,000 for his "creative ideas." (Pl.'s Dep. at 94-95; Def.'s Mot. at Ex. 10.)

On January 11, 2006, Plaintiffs filed their first amended complaint, in which they alleged a "breach of contract and/or a breach of contract implied-in-fact" and "anticipatory breach of contract and/or breach of contract implied-in-fact." (*See* First. Am. Compl. at ¶¶ 30-31.) Plaintiffs also claimed that they have been "directly and proximately been damaged by Defendant's breach or anticipatory breach in an amount in excess of $75,000. (*Id.* at ¶ 32.)

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has

carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") (citations omitted). The court

does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DISCUSSION

In its motion, Defendant asserts that "Plaintiff has failed to prove a contract existed with Sandford." (Def.'s Mot. at 9.) In the remainder of the motion, Defendant discusses the elements of an express contract under Michigan law. In their corrected response to Defendant's motion, Plaintiffs assert that "Michigan law recognizes a claim for conversion of an idea if the idea was furnished by the plaintiff pursuant to an express or implied in fact contract." (Pls.' Corr. Resp. at 6.) Moreover, in their corrected response, Plaintiffs concede that the alleged contract at issue was "not an express contract, but rather an implied contract." (*Id.*)

Plaintiffs point to the following evidence in support of their contention that the parties had an implied in fact contract for Plaintiff to develop a marketing plan to sell Defendant's "Sharpies":[5]

1. Falshaw-Stolz 8/27/04 e-mail: "This is a viable idea." (*Id.* at Ex. 2.)
2. Stolz Deposition: Defendant recognized that its "Sharpies weren't being sold like they should in golf pro shops." (Stolz Dep. at 67.)
3. Stolz Deposition: Plaintiffs' idea was "not already recognized or being utilized by Defendant, i.e. it was novel." (Pls.' Corr. Resp. at 7 (citing Stolz Dep. at 44-47).)[6]

---

[5]Defendant maintains that what Plaintiffs call a marketing plan was a "proposal for a manner of display that should 'be prominently displayed.'" (Def.'s Reply at 2.)

[6]Although not specifically stated by Plaintiffs, the court assumes that Plaintiffs are referring to Stolz's testimony that none of Defendant's ads "state to the reader that they should market logoed pens, logoed Sharpies to the golf course market in a container that displayed in conspicuous fashion the logo," *see* Stolz Dep. at 45, and none of the

4.    Pl.'s Deposition: Defendant asked Schwartz to provide pricing flyers for use at the PGA trade show. (Pl.'s Dep. at 45.)
5.    Hendrickson 1-31-05 e-mail: Hendrickson referred to "the new Sharpie Canister idea" and gave Plaintiff the display canister for free. (Pls.' Corr. Resp. at Ex. 6.)
6.    Hendrickson Mailer: Mr. Hendrickson stated that Sharpie Golf would like to "introduce [the company's] exciting new Sharpie Golf program," (*id.* at Ex. 7), and Plaintiffs assert that "[d]uring discovery, . . . Defendant was/is unable to produce anything similar in use prior to [P]laintiff." (*Id.* at 9.)

(*Id.* at 7-9.) Plaintiffs ask "[i]f . . . [Plaintiffs were] merely seeking opinions from Defendant on the use of a particular display that he created for the marketing of Sharpies, why would he abruptly be told 'we're going in a different direction.'" (*Id.* at 9-10.) Plaintiffs assert that "[a]t a minimum, there is a question of fact as to whether the parties had been engaged in discussion about a 'marketing idea' to be utilized by Defendant or whether Schwartz was merely seeking Defendant's opinion on his own plan for marketing Sharpies." (*Id.* at 10.) In addition, Plaintiffs claim that "[t]here is also a material question of fact on whether the parties had an understanding, explicit or implied, that [Plaintiff] would be compensated for his idea if adopted." (*Id.*)

In their First Amended Complaint, Plaintiffs alleged that:

> Plaintiffs' sales concept was for Defendant to direct market and/or target golf pro shops with a distinct, conspicuous, disposable and prominent display unit to be provided, or sold, to pro shops with their first or next order of Sharpies. Further, the Sharpies would be offered with imprints of the customers name or logo and with a display unit designed to hold the markers in a position that prominently displayed the imprint.

(Pls.' Am. Compl. at ¶ 14.) Plaintiffs further claimed that:

> Bob Stolz, upon learning of Plaintiffs' concept, openly expressed interest

---

ads "speak to the reader and say that they should market the Sharpie pens to the golf pro shops in a point-of-sale container that was conspicuous and visible." *Id.* at 46.

> in the idea, admitted that the Defendant had a problem selling this product to this defined market, agreed that Plaintiffs' idea was a viable solution and agreed that, if Plaintiffs' concept was used, Plaintiffs would receive the exclusive right to market Defendant's product using the concept with the agreed container.

(*Id.* at ¶ 15.)  In addition, Plaintiffs claimed that "[t]he parties agreed upon all of the material terms of a contract and/or contract implied in fact."  (*Id.* at ¶ 20.)

Plaintiffs rely on *Wrench v. Taco Bell*, 2003 WL 21653410 (W.D. Mich. May 1, 2003), in support of their contention that "the only difference between an express contract and an implied contract is the mode of expressing assent, and that contract obligations are created to enforce promises which are manifestations not only of a present intention to do or not to do something, but also of a commitment to the future." (Pls.' Corr. Resp. at 7.)  Plaintiffs allege that "[t]he intentions of the parties to this transaction were clearly manifested in the actions and admissions of . . . Defendant" and "[t]hese actions, through Defendant's agents, were ones of acceptance, negotiation, and eventually use."  (*Id.*)

The district court in *Wrench*, held at 1998 WL 480871 (W.D. Mich. June 18, 1998), that "Michigan law recognizes an action for conversion of an idea if the idea was novel or original and furnished by the plaintiff to the defendant pursuant to a legal relationship created by express or implied-in-fact contract, quasi-contract, or fiduciary obligation." *Id.* at *9.[7]  When the case was appealed, the Sixth Circuit held that "Michigan would not impose a requirement of novelty in an action based upon a contract

---

[7]The district court later ruled, at 51 F. Supp.2d 840 (W.D. Mich. June 10, 1999), that "[b]ecause Taco Bell concedes that there is sufficient evidence to support such an understanding in this case, Taco Bell's assertion that Plaintiffs cannot establish an implied in fact contract must be rejected." *Id.* at 848.

implied in fact." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 462-63 (6th Cir. 2001). The Sixth Circuit's statement dispenses with the novelty requirement, but requires, at least implicitly, that there first be a contract implied in fact. *Id.*

In its reply brief, Defendant asserts that Plaintiffs' evidence does not meet the legal standard for an implied-in-fact contract, but "at most, . . . show[s] that Sandford was actively seeking to expand its reach into the golf market for Sharpie sales." (Def.'s Reply at 1.) Moreover, Defendant maintains that "[a] sales display is not a novel idea." (*Id.* at 2.) The court agrees.[8]

"'A contract implied in fact arises when services are performed by one who at the time expects compensation from another who expects at the time to pay therefor.'" *Reed v. Yackell*, 703 N.W.2d 1, 7 (Mich. 2005) (citing *In re Spenger Estate*, 67 N.W.2d 730 (1954)). In an unpublished case that provides instructive, albeit not binding, language, the Michigan Court of Appeals held that:

> A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of men, show a mutual intention to contract. A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the

---

[8]In its reply brief, Defendant also asserts that "Plaintiffs contend for the first time that they should be permitted to pursue damages under a contract implied-in-law theory." (Def.'s Reply at 4.) Plaintiffs, however, alleged in their complaint that Defendant's conduct constituted a "breach of contract and/or a breach of contract implied-in-fact." (Compl. at ¶ 30.) Moreover, in their response brief, Plaintiffs state that the purported contract at issue was "not an express contract, but rather an implied contract." (Pls.' Resp. at 6.) The sentence immediately following this statement propounds that "Michigan law recognizes a claim for conversion of an idea if the idea was furnished by the plaintiff to an express or implied in fact contract." (*Id.*) In any event, a response to a Defendant's motion for summary judgment is an inappropriate pleading in which to seek to amend one's complaint, and the court will consider only Plaintiffs' claim as it is delineated in Plaintiffs' complaint: an allegation of contract implied in fact.

10

> parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction. The existence of an implied contract, of necessity turning on inferences drawn from given circumstances, usually involves a question of fact, unless no essential facts are in dispute.

*Aero Taxi-Rockford v. General Motors Corp.*, 2006 WL 1479915, at *14 (Mich. Ct. App. May 30, 2006).

Plaintiffs' evidence shows only that Defendant was seeking to expand its marketing of "Sharpies" to golf courses. *See e.g.* Stolz Dep. at 67. Plaintiffs have not presented evidence that Defendant stated that it was not already selling logoed "Sharpies" to golf courses using a highly visible point-of-sale display. Instead, Schwartz testified that as of August 27, 2004, "logo Sharpies [were] being marketed to golf courses," "fliers [were] being used to market them directly to the pro shops," and "pro shops [were] also being called on by representatives to sell the logo'd Sharpies to them." (Pl.'s Dep. at 72.) Plaintiff's key idea was to display the "Sharpies" so that the logo on each pen would be more easily seen. (*See* Def.'s Mot. at Ex. 8.) A reasonable jury could determine only that Plaintiffs proposed a form of display that Schwartz, in his deposition testimony, conceded that Defendant rejected. (Pl.'s Dep. at 52.) Plaintiff has not presented evidence that creates an issue of fact to suggest that Defendant improperly used any form of a marketing display that only Plaintiff had proposed. In sum, with no essential facts relating to the events that transpired in dispute, Plaintiffs have not presented evidence from which a reasonable jury could conclude that a contract implied in fact existed. *See Aero Taxi-Rockford*, 2006 WL at *14. Accordingly, the court will grant Defendant's motion.

## IV.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 27] is GRANTED.

      S/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  July 18, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 18, 2006, by electronic and/or ordinary mail.

      S/Lisa Wagner
      Case Manager and Deputy Clerk
      (313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\05-71109.BRADLEY.GrantingSJ.3.wpd